# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.                Case No. 10-CR-85

**TAMMY YAMBOR**
   **Defendant.**

## SENTENCING MEMORANDUM

Defendant Tammy Yambor pleaded guilty to interstate transportation of funds obtained by fraud, contrary to 18 U.S.C. § 2314, arising out of a scheme to steal from her employer. I ordered a pre-sentence report ("PSR") and set the case for sentencing. In imposing sentence, I first calculated defendant's advisory sentencing guideline range, then determined the actual sentence on consideration of all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010). This memorandum sets forth written reasons for these determinations.

## I. GUIDELINES

Defendant's PSR set a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2), then added enhancements of 10 levels based on the loss amount, § 2B1.1(b)(1), and 2 levels for abuse of a position of trust, § 3B1.3. The report then deducted 3 levels for acceptance of responsibility, § 3E1.1, for a final offense level of 15. Coupled with defendant's criminal history category of I, level 15 produced an imprisonment range of 18-24 months. Neither side objected to these calculations, which I found correct and adopted accordingly.

## II.  SECTION 3553(a)

**A.   Sentencing Factors**

Section 3553(a) directs the sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;  (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

After considering these factors, the court must impose a sentence sufficient, but not greater than necessary, to satisfy the purposes of sentencing set forth in § 3553(a)(2).  While the district court must give the guidelines respectful consideration in making this determination, it may not presume that a guideline sentence is appropriate.  Nelson v. United States, 129 S. Ct. 890, 892 (2009).  Rather, the court must make an independent determination as to the appropriate sentence, taking into account the types of sentences available, the relevant § 3553(a) factors, and the arguments of the parties.  See Gall v. United States, 552 U.S. 38, 49-50 (2007).

**B.     Analysis**

**1.     The Offense**

Between September 2001 and November 2005, defendant defrauded her employer, Waukesha Health Care ("WHC"), in various ways. Defendant managed two of WHC's clinic locations and in 2005 served as WHC's director of process improvement, which involved her overseeing the implementation of an electronic medical record system. In that position, she had the authority to create accounts payable records for vendors working on the project. Her primary fraudulent conduct involved the creation of a fictitious vendor: between May and November 2005, she submitted twelve bogus invoices for this vendor, which as manager of the project she was able to approve for payment. She then obtained eleven WHC checks totaling $152,000, which she caused to be delivered to First National Bank of Omaha and to be applied as payments to her personal credit card account.

Between September 2001 and October 2005, defendant also submitted false expense reports in her own name and, on five occasions, in the names of two WHC physicians. Based on the reports submitted in her own name, she obtained about $32,000 to which she was not entitled. Based on the reports for the physicians, done without their knowledge or approval, she got about $3000; she converted those checks to her own use by endorsing them and depositing them into her bank account in Wisconsin.

Finally, on or about December 11, 2001, and June 3, 2005, defendant fraudulently submitted false tuition reimbursement requests, which overstated her credit hours, thereby causing WHC to issue her about $3400 in tuition reimbursement payments to which she was not entitled.

3

The total loss from these schemes exceeded $191,000. However, defendant made full restitution to WHC and its insurer prior to sentencing.

**2.     The Defendant**

At age thirty-seven, defendant had no prior criminal record and an otherwise positive background. She graduated high school and college, and compiled a solid work record. Married for ten years, she had two young children with her husband, ages seven and two. It appeared that defendant and her husband experienced marital difficulties during the period of time the offense occurred, but they underwent marriage counseling and things seemed to be going better since then.

Defendant also took steps to get back on the right track herself following discovery of her crimes, commencing individual counseling and promptly finding another job. The court received a letter from her counselor, Dr. Diane Garrison, who indicated that she treated defendant since the day after she was fired by WHC for misappropriation of funds. Dr. Garrison diagnosed defendant with compulsive spending/shopping, an impulse control disorder. She explained that the disorder became severe while defendant worked for WHC, as she began shopping on-line as a means of relieving stress. As her husband was fiscally conservative, she took out personal credit cards to pay for her purchases, which began to spin out of control. She then started writing checks from the clinic to pay her credit card bills. Dr. Garrison wrote that getting caught was actually a huge relief for defendant, and that defendant has made great progress in treatment, understanding the compulsive nature of her behavior and working with her husband to set healthy limits on shopping and money management. Dr. Garrison indicated that although defendant could have completed treatment over three years ago, she remained for nearly five years because of her strong desire to learn healthy coping

skills, change life long unhealthy belief systems, and make sure she never repeated her addictive or illegal behavior again.

The court also received letters from individuals associated with defendant's current employer. Her direct supervisor from 2006 to 2009 indicated that defendant was dedicated and hard-working and gave no reason to question her honesty or integrity. A co-worker also attested to defendant's ability, demeanor, and professionalism. Her department director described her performance as excellent in every way. He indicated awareness of her legal problems and that defendant was forthcoming with him regarding her past mistakes. He nevertheless relayed complete trust in her.

Finally, as indicated above, defendant made full restitution to the victim, which required a considerable effort, including taking out a second mortgage and borrowing from relatives. This was not an instance of a wealthy person trying to buy her way out of punishment.

### 3. The Sentence

What made this case difficult was the dichotomy between the offense and the offender. This scheme went on for a significant period of time, involved different methods of fraud, and cost the victim nearly $200,000. On the other hand, defendant had no prior record, an otherwise positive background, strong family support, and a demonstrated commitment to address the issues leading to her offense.

The guidelines called for a term of 18-24 months in prison, and while they accounted for the loss, abuse of trust, and lack of prior record, they did not consider either the payment of full restitution prior to sentencing or defendant's mental health issues and treatment. I also noted that in the five years since her commission of the crime defendant found a new job, which she appeared to be performing well, for an employer aware of her crime, and with no

5

recurrence of these sorts of issues. She lacked authority to approve expenditures in her current job.

Given her lack of prior record, her progress in treatment, and her current employment situation, I saw no need for prison to protect the public from similar or any other criminal conduct. Nor did I see a need for prison to deter her from re-offending. Supervision in the community with strict conditions could satisfy these purposes. Obviously, a sentence served in the community served the additional salutary purposes of permitting defendant to care for her two young children and continue working. It was not clear whether her job would still be there after a prison sentence.

The only purpose of sentencing that tended to support a custodial sentence was the need for just punishment; this was a very serious offense, involving a lot of money and a serious abuse of trust. Although mental health issues played a part in the conduct, the record suggested no mitigation in the form of financial need or desperation; defendant and her husband made a decent living. A spending compulsion provides no excuse for theft.

Ultimately, I was guided by the parsimony provision – the sentence had to be sufficient but not greater than necessary to satisfy the purposes of sentencing. I concluded that I could fashion a sentence, served in the community, that would suffice. In order to provide a sufficient measure of punishment, I imposed as a condition of probation a lengthy period of home confinement. As the Supreme Court recently explained: A probationary sentence is "not granted out of a spirit of leniency."

> [While] custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,] [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They

6

must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

Gall, 552 U.S. at 48 (internal citations omitted). In the present case, I imposed a special condition that defendant served 12 months of home confinement, a substantial restriction on her liberty.

### III. CONCLUSION

For these reasons and those stated on the record, I placed defendant on probation for a period of 3 years. I found this term sufficient to ensure monitoring. As conditions, I prohibited defendant from holding employment having fiduciary responsibilities during the supervision term without first notifying the employer of her conviction, or holding self-employment having fiduciary responsibilities without consent of the supervising probation officer; required her to provide access to all financial information requested by the probation officer; required her to perform 10 hours of community service work per year, in lieu of a fine; and required her to comply with the conditions of home confinement for a period not to exceed 365 consecutive days. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 1st day of October, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge